Final case is 25-1514 Vickers v. United States. Mr. Wilson, you may proceed. Thank you, your honor. Good morning. May it please the court, my name is Nathan Wilson and I represent the plaintiff appellant, the estate of Katherine Vickers. May I reserve four minutes for rebuttal? Yes. Thank you. Ms. Vickers died covered in filth at a subpar nursing facility as a direct result of defendant's failures. The district court erred by rejecting all of her claims and we ask this court to reverse. While the briefs before this court covered a lot of subjects, in our limited time today, I'd like to focus on the two most critical issues. First, why the district court's resolution of the Federal Tort Claims Act's claims was erroneous. And second, why the district court erred in dismissing the sex discrimination claims. Regarding the Tort Claims Act, the district court found that they were time barred. It found that they accrued in August of 2017. While we dispute that, even if that's true, the district court's application of the continuous treatment doctrine was erroneous and deserves this court's review. Under the continuous treatment doctrine, as this court has recognized in Otto and in Miller, as long as a patient maintains the confidential relationship with their care provider, a medical malpractice claim against that provider is told. Now here, the district court found that Ms. Vickers met with her primary care provider, Dr. Hume, in July of 2017 and found that Ms. Vickers met again with Dr. Hume in February of 2018. Yet the district court concluded that the continuous treatment doctrine did not apply because in the interim, Ms. Hume went and saw a specialist. Now taken to its logical extreme, this is going to create a problematic rule for application of the continuous treatment doctrine. Let's say you see your primary care provider once a year on January 1st, and then you see your eye care provider halfway through the year on July 1st. Under the district court's reasoning, as soon as you see that eye care provider, you have interrupted the care from your primary care provider, and the continuous treatment doctrine would not apply. Mr. Wilson, can I ask you about that? I think you actually had a pretty decent argument on that issue, but the district court then went on and decided the claim on the merits, right? So if we agree with that, we don't need to deal with this continuing care doctrine, do we? Well, we disagree that the district court actually decided these issues for a couple reasons. First of all, it never says that it's offering these as alternative bases. It says it's only offering them to try and help this court understand the facts. And if the district court says it concluded that these claims were time-barred, which means that sovereign immunity would have attached because sovereign immunity attaches to all claims not filed within the FTCA window. But if sovereign immunity attaches, then the district court lacks subject matter jurisdiction. And courts are cautioned all the time, if you lack subject matter jurisdiction, stop. Go no further. You don't have jurisdiction to make findings of facts and conclusions of law on the merits. And that's actually extremely prejudicial to the state of Ms. Vickers here, because she has another federal court case going on in Washington, DC, right now, in the DC district court. And that case has stayed to see the resolution of this appeal in the Fourth Circuit. And based off the resolution of that issue, the district court is considering applying collateral estoppel to the district court's findings of facts and conclusions of law. But that can't work. And that is a clear error if the district court found it lacked subject matter jurisdiction, and then went and entered these findings of fact and conclusions of law, that could then be used to collaterally estop a case in a separate district court. So for that reason, we don't read the district court as offering these findings of fact and conclusions of law as binding. And to the extent it did, it would be an error because it found it lacked subject matter jurisdiction. So what would change, though, if we were to send a case back, the district court has made its findings, it would simply just reenter them? Is that how would that work? No, Your Honor, the proper remedy would be a remand for a new trial. First of all, because it didn't have... Sorry, Judge? No, go ahead. I'm sorry. First, because it didn't have subject matter jurisdiction to enter these, or it believed it did not. Second, because in order to reverse its findings on the underlying facts that go to the continuous care doctrine, this court would be striking some of its findings as clearly erroneous, indicating that the district court erred in its analysis of the facts. And then third, we've also pointed out some examples of why the district court specific findings were clearly erroneous. So for example, the district court found that there was no evidence that the reduction of Ms. Vickers' brain tumor, it improved her incontinence. And yet, as pointed out in our briefs, if you compare her prescriptions before the tumor reduced and afterwards, it goes from being prescribed numerous pads for daily usage to no pads being prescribed. And there's no dispute that all of her other diagnoses remain the same. So the only thing that changed was her tumor got smaller. And yet the district court found it could not credit the expert testimony or itself trace this logical correlation. And there are other errors like that throughout the district court's findings. So for all these reasons, if this court agrees with us on the continuous treatment issue, or if it agrees with us on the equitable tolling issue, the correct remedy is to strike the district court's findings and remand for a new trial. So when you first opened, you laid out the continuous care doctrine as applicable because of the words you used were maintaining contact. But I don't read that as sufficient to apply the continuous care doctrine. In Otto, what the court says is the patient is excused from challenging quality of care being rendered until the confidential relationship terminates. So is your argument then that there continued to be a confidential relationship during this time period when the daughter was basically calling to report what was going on with her mother? Yes, Your Honor. So there's several statements in the evidence, whether by the daughter reporting what Ms. Vickers said, that she wanted to maintain Dr. Hume as her primary care provider. Right. But that doesn't mean that a confidential relationship is maintained simply because the daughter says she wants to maintain. It doesn't mean she was. My understanding is what she was doing, in fact, was simply passing along information so that she could call in prescriptions because under the VA insurance, it was necessary for the VA doctor to call in the prescriptions. But in fact, the care had been transferred to Duke where there was care for individuals undergoing cancer treatment. The care for the cancer treatment itself has been moved to Duke, but the types of care is different. Dr. Hume is Ms. Vickers' primary care provider. And so for primary care, and you see that with the coronation of all of Ms. Vickers' other medications with the specific treatment she was receiving at Duke, a primary care provider has to do that. There is no finding that Ms. Vickers saw another primary care provider from July of 2017 to February of 2018. And of course, you don't go in person to see your primary care provider every month. In general, that's only probably a once a year, maybe twice a year meeting. And so the primary care provider relationship remained unchanged, even if Ms. Vickers was receiving specialist treatment for a specific issue. And so that is why the continuous treatment doctrine remains applicable. We would also point out that under the equitable tooling doctrine, to the extent of this court, we're to reach that. It doesn't matter whether it finds North Carolina law or federal law to apply for tolling, because I don't understand the United States disagreeing that whichever one applies, if Ms. Vickers was incompetent, then equitable tolling, whether under North Carolina or federal law, would apply. And this court recently clarified the standards for tolling in Justice v. Clark. Now, while that was a habeas case, this court in doing so spoke generally to the tolling that can apply to any time limitation and thus analogous to the Federal Tort Claim Act here. And this court specifically held that you don't need an actual adjudication of incompetence. And yet the trial court in its findings rejected the finding that Ms. Vickers was incompetent because there was no adjudication. But this court in Justice says, look to the evidence. So when we look to the evidence, we see Ms. Vickers never lived independently following her hospitalization in July of 2017. On July 3rd, 2017, Hume expressed that there was serious cognitive decline by Ms. Vickers, and Ms. Vickers was having difficulty comprehending what Dr. Hume was saying. That's on Joint Appendix 1156 to 1157. These are all factual findings by the district court, which we provide extremely deferential review. So we would have to find that they were clearly erroneous in order to even to reverse. What you're suggesting to me is that there's evidence on both sides and that potential that there's an argument for the other side, not that they're clearly erroneous findings. The district court's language was no evidence. And I'm providing evidence that the district court somehow missed. That is the definition of a clear error, for it to say there was no evidence and for Ms. Vickers' own primary care provider to be testifying that there was serious cognitive decline. So that's the basis. Did she testify that she was incompetent as a matter of law? No, there was not testimony that she was incompetent as a matter of law. But again, justice says that level of adjudication is not required for equitable tolling to end. So given that the district court found there was no evidence and said the record was replete with evidence of Ms. Vickers' cognitive decline, that was a clear error and further supports equitable tolling. But wasn't her daughter, didn't her daughter have power of attorney in August of 2017? Around August of 2017. It might've been a little bit later. And didn't her daughter around August of 2017 become aware of the brain tumor and alleged in an email to Dr. Hume that the doctors should have known about it? That's what the trial court found. I believe this... That's what the email says, right? I believe this was the claim of disappointment. Okay. Well, and then the daughter is the one who filed the lawsuit, correct? So a competent person was aware and had power of attorney and filed the lawsuit. That was the daughter. You're not alleging the daughter was incompetent, are you? No, we're not alleging the daughter was incompetent, but rather that the daughter had to wait until Ms. Vickers was deceased in order to have full control over the estate to make that decision. Moving on to the sex discrimination claim, there's sort of two errors here. The first error is the failure of the district court to recognize that this was a civil rights claim as opposed to a Federal Torts Claim Act claim. If you look in the complaint itself, the complaint doesn't mention the Federal Torts Claim Act when discussing the sex discrimination claim, and it doesn't name any specific statute. However, there's no requirement for a complaint to survive a motion to dismiss to actually identify a statute. You're talking about that SF-95 form? Yes, Your Honor. Okay. Well, it also, you know, what else it doesn't mention is gender or discrimination. Isn't that fatal to your claim? There's no SF-90 form required to bring a sex discrimination claim in the provision of medical services by the Federal Government. And even if it was required, the SF-95 says the Asheville VA did not have an appropriate facility for a female veteran of Ms. Vickers' age. It reiterates again that the facility wasn't safe for her as a female veteran. And you're saying that referencing that she was a female is sufficient to allege gender discrimination? Yes, because it was emphasized that that's why the Asheville VA didn't take her. And the standard for evaluating an SF-95 is only if the government were to investigate this claim, would it understand the basis of liability? And here, if the government were to investigate why Ms. Vickers wasn't allowed into the Asheville VA's Continuing Treatment Center, even though it was rated five stars, either one to three best in the only reason she was not admitted was because she was female. But those facts... Could I ask you about that statement in the form? It also alleges, seems to suggest that there might be an age and physical limitation claim as well. So you've got three separate claims presumably alleged. So how's the district court supposed to discern all of that from that statement? From the SF-95? Yes. I mean, it says the statement, the sentence that you rely on was, where is it? The Asheville VA did not have an appropriate facility for a female veteran of Ms. Vickers' age with the physical limitations she had and emotional vulnerability, et cetera. So those are sounds like three separate claims. Well, Your Honor, I think the most important part is the ending when the SF-95, the end of that sentence, when the SF-95 brings it together to explain why it matters. It's not just the physical limitations. It's not the limited cognition. It's because all those combined, the Asheville VA found it wasn't safe for her as a female veteran. Because a continuing care facility applies, it takes care of people with physical limitations, with cognition difficulties. The only reason it didn't work here was because she was a female veteran. So looking to the extent the SF-95 is required, the text of it satisfied the standard of presentment. But again, for a civil rights claim of sex discrimination against the federal government, in the provision of medical services, SF-95 and presentment is not required. Then you have the other problem, though, that you then expand the basis, the legal basis for the claim as being related to the Affordable Care Act, which is the first time that statute makes an appearance in this case on appeal. So the district court never had an opportunity to engage with that specific theory. So why isn't that claim forfeited? The claim is not forfeited because in her submissions to the magistrate judge of evidence to support her discrimination claim, she added a VA form 10-0381, that's on joint appendix 178, which is a civil rights claim against the VA. So it was against the district court. And correct, the specific statutory citation was not signed before the district court that I can find, although it was in our interlocutory appeal and it is now here. That being said, that is just an enforcement statute for the type of claim, which is a sex discrimination claim for deprivation of medical services, which is clear from the face of the complaint. And if your honors have no further questions, I'll save the balance of my time for rebuttal. All right. Thank you, Mr. Olson. Thank you, your honors. Mr. Letzring. Good morning, your honors. May it please the court. My name is Jonathan Letzring and I'm here on behalf of the United States. After several years of litigation that culminated in a four-day bench trial, the district court correctly ruled in favor of the United States in this FTCA medical malpractice case. The district court got it right and its judgment should be affirmed. Judge Ridinger made extensive factual findings and credibility determinations in his 69-page order following this bench trial and ultimately correctly concluded that the estate failed to prove its claims. As the court is aware, there were multiple grounds supporting the district court's decision. I'd like to first talk about something that was brought up by Mr. Wilson. And that is the notion that the district court did not reach the merits of the claims. That is incorrect as I see the district court's order. The district court never concluded that it did not have subject matter jurisdiction. And in fact, under United States v. Wong, which is a case, ironically, that the appellant cites in their brief, United States Wong is an FTCA statute of limitations case. And in that case, the Supreme Court found that for statute of limitations purposes, that issue is not jurisdictional. So ironically, it may have been an error for the district court if it had said that there was no subject matter jurisdiction. But in any event, the district court addressed the issue of timeliness because that was an issue that the government had raised throughout the case and correctly concluded that the claims were not timely. And that was based upon extensive factual findings and a full record at trial. Unlike most of the statute of limitations cases and most of the continuous treatment doctrine cases that are reported, this one is very different because it was handled at a bench trial. I'm sorry. Did I echo? You did, but I think you're fine now. Okay. My apologies. So not only did we have the medical records themselves, but we also had Ms. Roos' testimony as well as Dr. Hume's testimony. And there was nothing that was clearly erroneous about the district court's findings in that regard. Judge Berner is correct. The finding was that there was no confidential relationship as of August 30th, 2017 as between Dr. Hume and Ms. Vickers. At that point, the district court found that the relationship had changed to a point where Dr. Hume, while still involved in the loop, her role was administrative in nature. It was not to treat the underlying condition for which we are now here and there's a claim that somehow there was negligence. Can I ask you about that? Is that what's required? I mean, if she had remained as a Ms. Vickers primary care physician treating other issues beyond the issue that forms the basis of this case, you wouldn't say that she wouldn't continue to have a doctor-patient relationship, would you? Your Honor, the question you ask is a good one because the continuous treatment doctrine cases, as I read them, are a bit murky as to the outer limits of what that is. I think the difference here is Ms. Vickers had been not only physically transported to Duke, but Duke had taken over her care for her brain tumor. This is not a case where Ms. Vickers was going back time and again for other medical issues with Dr. Hume. If that were the case, I could see it could be viewed differently. In fact, one of the plaintiff's experts in the case, Dr. Friedman, he actually admitted and acknowledged that the quarterback for the care for Ms. Vickers' brain tumor was Duke, was the Duke facility, not the VA. I would also add that this case doesn't fit within the rationale of the continuous treatment doctrine. The idea of this doctrine is we don't want to put a patient in a difficult situation where they're required to contest or to challenge the care that they're receiving while they're still receiving it from that particular provider. Here, as we know, by August 28, 2017, Ms. Roos had already complained about Dr. Hume and a message from Ms. Vickers' VA online portal. I would also submit that this case doesn't fit within the rationale of that doctrine. And finally- Judge Sniff, how are we reviewing that determination on the part of the district court? Is that a legal determination or is that a fact determination or a mixed question? Judge Berger, I want to make sure I understand your question. Are you asking about specifically the rationale piece that I just asked about or that I just mentioned? I'm asking about the application of the continuous care doctrine. Right. I think it's probably a mixed question to some extent. I think when it comes to the application of the doctrine, it necessarily requires the district court to engage in factual findings. The district court has to look at the nature of the relationship. It had to review the medical records. It had to hear Ms. Roos' testimony where, of course, she was at some of these appointments, what were the purpose of these appointments, as well as the testimony of Dr. Hume. So there are certainly factual findings that underpin the district court's determination on this issue. I would finally mention that this is an issue that the estate carried the burden on, not the United States. The estate carried the burden of showing that the continuous treatment doctrine applied, and they failed to show that it did. Now, putting that aside, there were multiple other bases upon which the district court's is supported and upon which it was grounded. One of the primary findings is there was no breach of the standard of care. This came down to a classic battle of the experts, and the estate's claims hinged on the theory that two and only two of Ms. Vickers' primary care physicians at the VA in Asheville somehow breached the standard of care by failing to tumor sooner. Chief Judge Reidinger conducted a thorough and careful review of all the evidence that was introduced at trial and ultimately found that our experts, the United States experts, were more credible than the plaintiffs. For instance, the testimony of the estate's primary care expert, Dr. Bondar, the district court found her testimony to be entirely this case that was submitted by deposition. But this was not a case even where the depositions were submitted in paper only. This was a case where there were video depositions of these physicians. So the district court also had an opportunity to review the demeanor of Dr. Bondar and see her credibility while these questions were being asked of her. And she admitted she had not served as a primary care physician since 2011. She couldn't articulate when the VA primary care providers should have provided Ms. Vickers a neurological consultation. And of course, Ms. Vickers' symptoms were nonspecific. Meanwhile, on the other hand, the district court found the testimony of the United States primary care expert, Dr. Spangler, to be much more credible and useful. He was a professor of medicine at Wake Forest University and is a primary care physician. And he explained, importantly, that when Ms. Vickers came to see Dr. Hume in 2012, she was medically encumbered at that point. She had numerous longstanding medical problems that included PTSD, insomnia, morbid obesity, osteoarthritis, fibromyalgia, diabetes, and urinary incontinence, which she had suffered from for years. And Dr. Spangler, looking at these constellation of symptoms, opined that the issues that Ms. Vickers experienced while she was under the care of both Dr. Hume and Dr. Rajkumar were nonspecific and much more reasonably attributable to these many comorbidities than ever to a brain tumor. And she also had an unfortunate history of noncompliance and mental health issues, which further complicated her care. So for all of those reasons, after reviewing the totality of the evidence, the district court correctly determined that the estate failed to prove that there was a breach of the standard of care. The district court's order didn't stop there. It also looked at the question of causation. And it examined that issue to see if the estate, even if there had been some sort of alleged negligence, which wasn't proven, was there any causation with any alleged injuries? And again, this issue boiled down to a battle of experts, with the United States' experts found to be more credible by the court. Ms. Vickers passed away at the age of 83 on October 16, 2018, from cardiac arrest, secondary to septic shock, and likely urinary tract infection. Dr. Bales, he was the United States expert, the only neurosurgeon who testified on the case. He explained that the brain tumor, an alleged delayed brain tumor diagnosis, did not contribute to her death. The tumor was an operable in 2017, nor was it operable in 2003, due to its location and characteristics. He also opined that the timing of the diagnosis did not cause any diminution in the quality of her life. Because of all of these comorbidities that I mentioned, according to Dr. Bales, it would not have made a meaningful difference if she had received chemotherapy for her brain tumor sooner. So, we have multiple bases supporting the district court's decision, and all of those findings, underpinning that, are factual findings, which this court should give deference to. Wasn't there also evidence that the brain tumor had been successfully treated, even if delayed? Correct, Your Honor. There was. The chemotherapy treatment that Ms. Vickers received did successfully treat her brain tumor. I note that Mr. Wilson mentioned, I believe, when he was arguing that there was somehow also evidence that her urinary incontinence improved. I don't see the evidence that way, and I don't think the district court did. There are some loose references in a medical record, perhaps, to needing fewer supplies at some point in time, but the experts were actually asked this specific question. Dr. Hatcher, the United States urology expert, was asked this question. Was there any evidence that Ms. Vickers' urology issues, specifically her urinary incontinence, did that improve after she received chemotherapy? The answer was no. There was no indication in the medical records of that occurring. Same with Dr. Bales, the neurosurgeon. He also examined that issue and, too, found that. The urinary incontinence issue is a bit of a sideshow because, ultimately, the urology expert for the plaintiff admitted there was no breach of the standard of care in any of the urology care that was provided to Ms. Vickers. Having talked about the merits as well as the statute of limitations issue, I'd like to now turn to the gender discrimination claim, which was mentioned earlier. The district court dismissed this claim correctly for a failure to exhaust. We have two documents we have to look at when we're analyzing this claim. We've got the SF-95, the administrative tort claim that was brought, but we also have the federal court complaint that the district court was also looking at. As I believe it was Judge Thacker noted, the administrative claim, although it mentions gender, it does not articulate any sort of gender discrimination claim or any desire to bring a gender discrimination claim. It doesn't really even say gender. It just says female veteran. It identifies her gender, but it doesn't say gender. That's right. There's the VA cause to have believed that she was attempting to bring some sort of gender discrimination claim at the administrative level. Now, the argument on appeal is, well, the district court should have analyzed this claim differently. A gender discrimination claim isn't typically a tort, and so it should have looked at it under the Affordable Care Act. I think as Judge Diaz mentioned, that was not argued below. This Affordable Care Act theory was not argued below. I think Mr. Wilson mentioned something about a civil rights complaint. As I recall the district court's handling of that, there was no evidence the VA actually received that civil rights complaint. That didn't advance the ball at all for the plaintiff. I would also point out something that I think is very important with regard to this claim, and that is if the court looks at the federal court complaint that was filed by the estate, paragraph 10, JA-19, quote, this case, and maybe I'm paraphrasing a bit because it's a portion of a quote, but this case is commenced and prosecuted against the United States pursuant to the Federal Tort Claims Act. The district court reasonably construed the complaint as being filed under the Federal Tort Claims Act because that's how it was pled, and therefore, of course, they're going to look at, the district court is reasonably going to look to see if the claims have been exhausted in accordance with the FTCA. I would also add the estate never objected to the dismissal of this claim at the district court level saying it should have been analyzed under a different statute. In fact, it actually doubled down. The estate argued that it did present the claim properly in its SF-95, so giving the district court even more reason to have analyzed it under the FTCA. Now, as a practical matter, I'll just add this claim, even though the district court didn't reach this issue, is entirely meritless on the face of the complaint. The theory that the VA should have placed Ms. Vickers in a facility for high-risk males, the complaint itself that Ms. Vickers, that the estate filed, acknowledges that they didn't do that for safety reasons because she had been rejected from multiple facilities and removed from one facility due to inappropriate sexual behavior that had occurred at that facility. So, for good reason, she wasn't put into the facility for high-risk males. There were other issues, obviously, that were raised in the briefs, but I'm happy to, but I'm content to rest on my briefs as to those issues, and I will conclude by, again, reiterating that the district court's order reflects a diligent, thorough, and careful examination of the facts and law upon a full record at trial. The conclusions were well-reasoned and fully supported by the record and the applicable law. The estate has not come close to carrying the heavy burden that would be necessary to overcome the many factual findings and credibility determinations that underpin the district court's judgment, nor has the estate demonstrated that the district court misapplied the law in any way. If there are no more questions from the panel, I will conclude by respectfully requesting that this court affirm the district court's decision in favor of the United States, and I will yield the remainder of my time. Thank you very much, Mr. Letourneau. Thank you. Mr. Wilson, you've got some time for rebuttal. Thank you, Your Honors. So I'll go in order of the arguments I heard to the most important ones I addressed. A quick clarification on Wong. Yes, Wong said that the two-year FTCA isn't a hard jurisdictional limit such that it can't be told, but it never changed the effect of when that statute of limitations applies, what happens then. The government tells you on pages 60 to 61 of its brief, once the statute of limitations attaches, sovereign immunity kicks in. And if sovereign immunity is kicked in, then the district court lacks subject matter jurisdiction. Going to the continuous treatment argument. Do you phrase these subject matter jurisdictions in your brief, these subject matter jurisdiction arguments? We mentioned jurisdiction specifically in the reply, and then in our opening brief, we argued that it was air for the district court to go further beyond resolving the statute of limitations claim or the statute of limitations issue. And doesn't Wong specifically say that the questions of the time limits are nothing more than time limits and that they're in fact not jurisdictional? Yes, as far as totally. But Wong doesn't change that whenever that line gets drawn, then sovereign immunity does attach. And I don't think Wong changes that once sovereign immunity attaches, then it's a subject matter jurisdiction issue. Moving on to the continuous treatment issue, I know there's been some discussion about what treatment Ms. Vickers was receiving from Dr. Hume in the intro. First, if one is only seeing their primary care provider once or twice a year, the fact that one sees a specialist is not an interruption of the primary care provision. But even so, looking to the joint appendix, you see on September 4th, 2017, Dr. Hume sent an information packet to Ms. Vickers discussing how to handle medication. That's on JA2876. On September 20th, 2017, JA2853, she discussed the benefits of condensing lab draws. Dr. Hume discussed that for Ms. Vickers. Then in November of 2017, JA2890, she provided a recommendation on diabetes management. What this shows is that throughout her specialist treatment, Ms. Vickers was continuing to rely on Dr. Hume for primary care provision. There was not an interruption, nor was there a finding that there was an interruption in primary care provision from July of 2017 through February of 2018. While the outer limits of the continuing treatment doctrine might be murky, they are not murky here under these facts, and the trial court erred in finding they did not apply. If I can provide some quick clarifications on the factual disputes regarding the standards of care and breach of causation and why there were clear errors, the district court said it found Dr. Bondar unpersuasive because she said she wasn't a primary care physician. Her actual testimony is that she wasn't labeled a primary care physician because she is a hospitalist, but they essentially provide the same services. They were both certified in internal, both Dr. Bondar and Dr. Hume were certified in internal medicine, and that was the medicine they both practiced. And then the, as far as causation, it's not, the argument is not that the brain tumor caused the death itself. The argument is the brain tumor caused increased urine leaks, which led to unnecessary treatments that then led to an antibody resistance that killed Ms. Vickers. And Dr. Hatcher limited his testimony to express no opinion on the impact of the tumor after 2014 when it could have been treated. For these reasons, Your Honor, we ask this court reverse the district court. Thank you. All right. Thank you both for your fine arguments this morning, I guess, still morning. I'm sure the panel is grateful for your presentations. And Mr. Wilson, I want to thank you in particular, since you jumped in here at the last minute and agreed to take this case on pro bono. Thank you for doing that. And again, thank you both for your arguments. We would come down and greet you, but obviously cannot do that. But we're grateful that you're here with us today. Thank you, Your Honors. Thank you, Your Honor. With that, the court will stand adjourned until tomorrow morning at 9 30.
judges: Albert Diaz, Stephanie D. Thacker, Nicole G. Berner